UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA PINKARD | ) | CASE NO. 1:13CV1339 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Barbara Pinkard Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his February 16, 2012 decision in finding that Plaintiff was not disabled because she could perform jobs that exist in significant numbers in the national economy (Tr. 21-37). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I. **PROCEDURAL HISTORY**

Plaintiff, Barbara Pinkard, filed her application for DIB and SSI on December 13, 2010, alleging she became disabled on January 14, 2008 (Tr. 58-59, 206-216). Plaintiff's application was denied initially and on reconsideration (Tr. 150-155, 161-173). Plaintiff requested a hearing before an ALJ, and, on December 7, 2011, a hearing was held where Plaintiff appeared with counsel and

1

testified before an ALJ, and Ted Macy, a vocational expert, also testified (Tr. 38-82, 175).

On February 16, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 21-37). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 4-7). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 42 U.S.C. Section 1383(c).

## II. STATEMENT OF FACTS

Plaintiff was born on October 20, 1961, which made her fifty years old at the time of the hearing (Tr. 31). Plaintiff graduated from high school and has past relevant work as a chef (Tr. 45). From 1993 through 2000, Plaintiff worked as the head chef at Dink's Restaurant in Chagrin Falls (Tr. 6-7). In this position, she was responsible for cooking breakfast and lunch, prepping for breakfast and lunch, cleaning, doing the inventory, and managing seven people (Tr. 46). From 2000 through September 2003, Plaintiff worked as a head chef at a daycare center, where she was responsible for preparing the food, cleaning up, and helping with the children (Tr. 45). Plaintiff left that job in 2003, when she required surgery to remove a hernia from her right lung (Tr. 46). Plaintiff lives with her eleven-year old son in a house (Tr. 43-44).

## III. SUMMARY OF MEDICAL EVIDENCE

Edward S. Feldman, M.D. treated Plaintiff's Crohn's disease and gastroesophageal reflux disease (GERD) (Tr. 50). On April 14, 2010, Dr. Feldman reported that Plaintiff's chronic Crohn's disease symptoms were controlled on Pentasa until March of 2010, when Plaintiff began having five to six bowel movements a day, as opposed to her typical two to three a day (Tr. 313). Dr. Feldman

planned to continue Plaintiff on Pentasa and add Flagyl, an antibiotic (Tr. 314). Dr. Feldman instructed Plaintiff to take Tylenol for her abdominal pain (Tr. 314).

On June 15, 2010, Plaintiff reported that her bowel movements had decreased back to two to three per day, and Dr. Feldman noted that her chronic Crohn's symptoms were improved with the addition of Flagyl to her medication regime (Tr. 306). Dr. Feldman continued Plaintiff on Pentasa, Flagyl, and Tylenol for infrequent abdominal pain (Tr. 307).

On October 25, 2010, Dr. Feldman reported that Plaintiff's GERD symptoms were adequately controlled on Carafate pills (a medication used to treat and prevent ulcers in the intestines) (Tr. 300). Although Plaintiff's Crohn's disease was controlled, she reported several interval episodes of exacerbation, which were associated with increased diarrhea and abdominal pain (Tr. 300). Plaintiff's bowel movement frequency was three to four per day (Tr. 300). Dr. Feldman continued Plaintiff on Pentasa, Flagyl, and gave her a prescription for ten Percocet pills for use when Tylenol was insufficient to control her abdominal pains (Tr. 301). Dr. Feldman also continued Plaintiff on Carafate (Tr. 301).

On June 7, 2011, Plaintiff reported that her treatment for GERD, which had been switched to Omeprazole (Prilosec, a proton pump inhibitor) from Carafate, was working well (Tr. 428). Plaintiff's Crohn's disease was controlled, although she was having some episodes of exacerbation with increased diarrhea and abdominal pain (Tr. 428). Plaintiff's bowel movement frequency was four to five per day; and she was using Imodium when needed, which was effective (Tr. 428). Dr. Feldman concluded that Plaintiff's GERD symptoms were well controlled and best controlled with Omeprazole (Tr. 429). For Plaintiff's Crohn's disease, Dr. Feldman continued her on Pentasa, Flagyl, and gave her a prescription for ten Percocet for abdominal pain (Tr. 429).

3

On September 13, 2011, Dr. Feldman reported that Plaintiff's GERD and Crohn's disease symptoms were controlled (Tr. 454). Plaintiff's bowel movement frequency was four to five per day, and she was not using Imodium (Tr. 454). Plaintiff was still experiencing episodes of abdominal pain once a week, with nausea lasting up to several hours, but without increased diarrhea (Tr. 454). All of Plaintiff's medications were continued (Tr. 455).

Rebecca Snider-Fuller, R.N., a psychiatric clinical nurse specialist, treated Plaintiff's depression and anxiety (Tr. 53). On January 5, 2011, Plaintiff saw Nurse Fuller for an evaluation (Tr. 334). Plaintiff reported that a series of events had overwhelmed her within the last few years (Tr. 334). In 1998, Plaintiff was diagnosed with Crohn's disease, and required surgery; in 2003, Plaintiff had a hernia removed from her right lung; and in 2006, Plaintiff's mother was diagnosed with Alzheimer's disease (Tr. 334). Plaintiff's symptoms included anxiety, panic attacks, sleep decrease, decrease in concentration, increase in isolation, irritability, low energy, poor motivation, and seeing shadows (Tr. 335). Nurse Fuller noted that Plaintiff's recent stressors included financial issues, health issues, caring for elderly parents, and raising her ten-year old son alone (Tr. 335).

On examination, Nurse Fuller reported that Plaintiff was adequately groomed with good hygiene; was cooperative and appropriate; was oriented to time, place, and person; displayed clear speech with a normal rate and tone; exhibited speech that was unpressured and goal-directed; had a logical, organized thought process with racing thoughts; displayed fair judgment and insight; had a distractable concentration span; and had a depressed mood (Tr. 337). Plaintiff denied auditory hallucinations, suicidal, or homicidal thoughts or intentions, and paranoid ideations (Tr. 337). Nurse Fuller started Plaintiff on Prozac, Titrate, and Trazodone for sleep (Tr. 338).

On January 18, 2011, Plaintiff reported to Nurse Fuller that her mother recently had to stay with her, which caused her great stress (Tr. 331). However, Plaintiff reported that her mother was

4

now back home with her father, who had early dementia (Tr. 331). Plaintiff expressed concern about her parents living alone in their house (Tr. 331). On examination, Plaintiff was well groomed with good hygiene; cooperative, anxious, and appropriate; oriented; displayed speech that was spontaneous with a normal rate and flow; displayed a logical, organized thought process with racing thoughts; exhibited some paranoid thoughts; did not have any suicidal or homicidal ideation, and no evidence of perceptual disturbance (Tr. 331). Nurse Fuller noted that Plaintiff's mood was a little better (Tr. 331). Plaintiff's affect was full; her attention and concentration was poor; her memory was within normal limits; and her judgment and insight were fair to good (Tr. 331). Plaintiff reported poor sleep due to her mother's dementia, but had one good night of sleep with the Trazadone (Tr. 331).

On February 10, 2011, Plaintiff reported that she was not feeling well, and was having spasms in her GI tract (Tr. 359). She discussed with Nurse Fuller establishing boundaries with her parents; and noted that she was not visiting her parents every day, was having issues with her siblings, who refused to visit their parents; and concluded that she had to take care of herself and her son (Tr. 359). Plaintiff stated that, since her last appointment, she had three to four panic attacks, which were triggered by "stupid stuff" (Tr. 359). On exam, Plaintiff was adequately groomed with good hygiene (Tr. 359). Plaintiff was cooperative, but anxious; oriented to time, person, and place; displayed spontaneous speech at a normal rate and flow; and displayed logical and organized thought content with some racing and paranoid thoughts, but did not have suicidal or homicidal ideations (Tr. 359). Plaintiff's mood was depressed, and her sleep, appetite, energy, and concentration were not good (Tr. 359). Nurse Fuller discontinued Plaintiff's prescription for Trazodone, started her on Amitriptyline, and continued her prescription for Prozac (Tr. 360).

On March 1, 2011, Plaintiff reported that she was "trying not to let things get to her" (Tr. 354). She indicated that she was "putting herself first," "moving ahead," and was "sick of crying and being

5

depressed" (Tr. 354). Plaintiff noted that she still cried, but not as often (Tr. 354). On examination, Plaintiff was adequately groomed with good hygiene (Tr. 354). Plaintiff was cooperative, anxious, and appropriate; oriented to time, person, and place; displayed spontaneous speech with a normal rate and flow; displayed a logical and organized thought process with some racing and paranoid thoughts; and did not have any suicidal or homicidal ideations (Tr. 354). Nurse Fuller noted that Plaintiff's mood was "not too bad," her sleep was better, her appetite was "pretty good," and her energy and motivation were "getting better" (Tr. 354). Additionally, Plaintiff's concentration was better, recent and remote memory was improving, and her judgment and insight were good (Tr. 354).

On April 4, 2011, Plaintiff told Nurse Fuller that she was "doing alright" (Tr. 440). Plaintiff noted that her sister-in-law had died, and she was dealing with things (Tr. 440). Although the situation with her parents had not changed, Plaintiff was not letting it "get to her," and was "doing better" (Tr. 440). On examination, Nurse Fuller concluded that Plaintiff's mood was getting better, her sleep and appetite were good, her motivation was getting better, her energy was low, and her concentration was better (Tr. 440). Plaintiff's recent and remote memory were within normal limits, and her judgment and insight were good (Tr. 440). Nurse Fuller concluded that the boundaries Plaintiff established with her parents was helpful, and her mood continued to improve (Tr. 441).

On May 4, 2011, Plaintiff again reported that she was "okay," was "dealing with everything," was not letting "things get to her," was still anxious, but was doing better (Tr. 435). Plaintiff noted that her mother now had hospice service, and she was not going to her parents' home every day (Tr. 435). On examination, Plaintiff was well groomed with good hygiene, cooperative, anxious, and appropriate, oriented to time, person, and place; displayed spontaneous speech with a normal rate and flow; was talkative; and displayed a logical and organized thought process with racing and paranoid thoughts (Tr. 435). Plaintiff's mood was better, her sleep was excellent, her appetite was difficult due

to her Crohn's disease, her energy was not good, but her motivation was getting better (Tr. 435). Concentration was difficult for Plaintiff, but her recent and remote memory were within normal limits (Tr. 435). Nurse Fuller concluded that the improved boundaries Plaintiff established with her parents continued to help her deal with the situation, and her mood continued to improve (Tr. 436).

On June 16, 2011, Plaintiff was doing "pretty well," and felt like she was "getting better" (Tr. 423). Plaintiff stated: "I have my moments but I'm getting it together" (Tr. 423). Plaintiff's brother was helping her parents more, and her parents were accepting more help from the social agency (Tr. 423). Plaintiff noted that her Crohn's disease was "acting up" (Tr. 423).

By August 24, 2011, Plaintiff's mother had been moved to a hospital, and Plaintiff was experiencing more restlessness in the evening (Tr. 450). On examination, Plaintiff was well groomed with good hygiene, cooperative, and appropriate, oriented, and displayed spontaneous speech with normal rate and flow (Tr. 450). Plaintiff did not show any evidence of paranoia or delusions, did not have suicidal or homicidal ideations, but was seeing shadows and having vivid dreams (Tr. 450). Plaintiff's mood was "okay," her sleep was not good, her appetite and motivation were good, her concentration was fair, her memory was okay, and her judgment and insight were good (Tr. 450). Nurse Fuller concluded that Plaintiff's mood was improved (Tr. 451).

On September 27, 2011, Plaintiff reported to Nurse Fuller that she was dong "okay" (Tr. 469). Plaintiff had been experiencing Crohn's disease flare ups, was relying more on her son, was having more "bad days" than "good days" with her Crohn's disease, and had anxiety (Tr. 469). Plaintiff's mother had severe dementia, and her father had early dementia (Tr. 469). On examination, Plaintiff was well groomed with good hygiene, cooperative, and appropriate, oriented, displayed spontaneous speech with a normal rate and flow, and displayed a logical and organized thought process with racing and tangential thoughts (Tr. 469). Plaintiff showed no evidence of paranoia or delusions, and had no

7

suicidal or homicidal ideations (Tr. 469). Plaintiff's mood, appetite, and energy were not good (Tr. 469). Nurse Fuller concluded that Plaintiff's symptoms had worsened due to her Crohn's disease flare ups (Tr. 470).

On September 27, 2011 (the same day as her appointment with Nurse Fuller), Jyoti Aneja, M.D. and Nurse Fuller completed a Medical Source Statement regarding Plaintiff's mental capacity (Tr. 460). Dr. Aneja and Nurse Fuller concluded that Plaintiff's ability to maintain appearance, manage funds and schedules, and leave her home on her own were very good (Tr. 460-461). Plaintiff's ability to follow work rules, use judgment, and understand, remember, and carry out simple instructions was good (Tr. 460-461). Plaintiff's ability to maintain attention and concentration for extended periods of two-hour segments, understand, remember, and carry out detailed, but not complex, instructions, and behave in an emotionally stable manner, was fair (Tr. 460-461). Plaintiff's ability to respond appropriately to changes in routine settings, maintain regular attendance, and be punctual, deal with the public, relate to co-workers, interact with supervisors, work in coordination with or proximity to others without being unduly distracted or distracting, deal with work stress, complete a normal workday and work week, understand, remember, and carry out complex job instructions, socialize, and relate predictably in social situations, was poor (Tr. 460-461).

### IV. SUMMARY OF TESTIMONY OF VOCATIONAL EXPERT

A vocational expert (VE) testified at Plaintiff's hearing (Tr. 38-82, 175, 201-202). The VE described Plaintiff's past relevant work as a cook and a restaurant cook, both skilled occupations at the medium to heavy levels of exertion (Tr. 74-75). He confirmed that Plaintiff did not acquire skills that would transfer to light or sedentary work (Tr. 74-75).

The ALJ posed two hypothetical questions to the VE (Tr. 75).  First, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and past work experience who can perform a limited range of light work, with no climbing ladders, ropes, or scaffolds, occasional climbing of ramps and stairs (Tr. 75).  The hypothetical individual would be able to perform simple, more complex tasks in an environment with routine changes in work routine, and there would be frequent contact with the general public, co-workers, and supervisors (Tr. 76).  The individual would be off-task five percent of the time, and would require positions, including occasional supervision with moderate to severe frequent pain symptoms, and require close availability of a restroom (Tr. 76).  The VE testified that such a hypothetical individual would be unable to perform any of Plaintiff's past work, but he was unclear on how to assess the limitation on moderate to severe frequent pain in vocational terms (Tr. 76).  The ALJ clarified that the moderate to severe frequent pain would be accommodated by the allowance for five percent off-task, leading the VE to identify jobs, such as a wire worker, an electronics worker, and a bench assembler, that would fit the restrictions (Tr. 77).

As a second hypothetical question, the ALJ asked the VE to consider the same hypothetical individual, except the individual would be off-task twenty percent of the workday instead of five percent (Tr. 78). In response, the VE testified that there would be no jobs, because that would be unacceptable in a competitive setting, and the individual would be replaced (Tr. 78).  On cross-examination, the VE testified that occasional supervision would restrict an individual to unskilled work, and, at the unskilled level, being off-task even eight to ten percent of the workday would be unacceptable to most employers (Tr. 80).  The VE further testified that an individual who is absent two or more days per month on a regular basis would be replaced even by a lenient employer (Tr. 80-81).

9

## V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII.    ANALYSIS

Plaintiff raises three issues:

- A.    Whether the ALJ's decision lacks substantial evidence due to the ALJ's failure to give deference to Plaintiff's treating physician.

- B.    Whether the ALJ's decision lacks substantial evidence due to the ALJ's misapplication of *Drummond* to reach his residual functional capacity assessment of Plaintiff's limitations.

- C.    Whether the ALJ's decision lacks substantial evidence due to the ALJ's reliance on an incomplete hypothetical question to the vocational

11

expert to reach his decision.

Plaintiff alleges she cannot work because she has Crohn's disease, gastroesophageal disease (GERD), and psychological problems. However, substantial evidence shows that Plaintiff's Crohn's disease and GERD were controlled on her medication regime. In addition, the ALJ correctly accounted for Plaintiff's functional limitations resulting from her physical impairments in his residual functional capacity (RFC) findings.

In regard to her mental impairment, the record shows that, during the relevant time period, Plaintiff was in the midst of caring for her ailing parents. This situational stressor caused Plaintiff to be depressed. Nevertheless, the counseling notes show a consistent improvement in Plaintiff's mood as she learned to set boundaries with her parents. Plaintiff repeatedly informed her counselor that she was doing "okay," and the mental health examination findings were consistently unremarkable. Plaintiff's counselor repeatedly described her as adequately or well-groomed with good hygiene, cooperative, appropriate, oriented, and displaying a logical and organized thought process. Plaintiff's judgment and insight was fair to good, her memory was within normal limits, and she never had any suicidal or homicidal ideations.

First, Plaintiff argues the ALJ failed to evaluate properly the September 27, 2011 opinion of Dr. Aneja and Nurse Fuller regarding Plaintiff's mental capacity to work (Pl.'s Brief at 11). Dr. Aneja and Nurse Fuller concluded that Plaintiff's mental capacity to deal with many work-related functions was poor (Tr. 460-461). The ALJ gave this opinion some weight, but only to the extent that it was consistent with the objective mental health evidence and his residual functional capacity findings (Tr. 31). The ALJ's residual functional capacity assessment limited Plaintiff to simple and more complex tasks in an environment with routine changes in the work routine (Tr. 28). The ALJ found Plaintiff could have frequent contact with the general public, co-workers, and supervisors (Tr. 28). The ALJ

further concluded Plaintiff can occasionally supervise because of moderate to severe pain symptoms (Tr. 28).

To be entitled to controlling weight, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must be consistent with the other evidence of record. 20 C.F.R. Sections 404.1527(c)(2); 416.927(c)(2). Under the regulations, if controlling weight is not given to a treating physician's opinion, the ALJ determines the appropriate weight to give the opinion by examining the length of the treatment relationship, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. Sections 404.1527(c)(2); 416.927(c)(2). These factors support the weight given by the ALJ to Dr. Aneja and Nurse Fuller's opinion.

The ALJ correctly concluded that Dr. Aneja and Nurse Fuller's opinion was only entitled to some weight (Tr. 31). The ALJ noted that Plaintiff's treatment notes indicate she did well on medication and her treatment was helpful (Tr. 31). The treatment notes show that, during the relevant time period, Plaintiff was experiencing stress from her family situation (Tr. 331, 334, 354, 359). In 2006, Plaintiff's mother was diagnosed with Alzheimer's disease, and Plaintiff's father was also ill; therefore, Plaintiff took responsibility for caring for her parents (Tr. 334). Plaintiff's mental health treatment focused on these parental issues (Tr. 331, 334, 354, 359). However, when Plaintiff began to set boundaries with her parents, her mood improved, and her level of stress declined (Tr. 354, 423, 435, 440). Thus, when Plaintiff began treatment with Nurse Fuller, she reported that she was overwhelmed by a series of events in her life, including her mother's Alzheimer's diagnosis (Tr. 334). In January 2001, Plaintiff reported stress when her mother stayed at her house while her father was in the hospital (Tr. 331). In February 2011, Plaintiff reported having a panic attack, stated she wasn't feeling well, and suggested she needed to work on boundaries with her parents (Tr. 359). By March 2011, Plaintiff's mood was described as "not too bad," and she reported that she was "moving ahead"

13

and was "sick of crying and being depressed" (Tr. 354). Plaintiff was sleeping better as well (Tr. 354). In April 2011, Plaintiff was "doing alright," and her mood was "getting better" (Tr. 440). Nurse Fuller noted that Plaintiff's mood was continuing to improve (Tr. 441). In May 2011, Plaintiff was "okay," was "dealing with everything," and was not letting things get to her (Tr. 435). Nurse Fuller also concluded that Plaintiff's mood continued to improve (Tr. 436). In June 2011, Plaintiff was "doing pretty well" (Tr. 423). Plaintiff felt that she was getting better (Tr. 423). Nurse Fuller noted that Plaintiff's mood was pretty good, and her sleep was good (Tr. 423). In August 2011, Plaintiff began to experience some restlessness in the evening because her mother was in the hospital (Tr. 450). Nevertheless, Nurse Fuller described Plaintiff's mood as "okay," and concluded it was still improved (Tr. 451). In the last treatment note, Plaintiff reported having a Crohn's disease flare up, but she still felt she was "doing okay" (Tr. 469).

The treatment notes indicate consistent improvement in Plaintiff's mood and ability to deal with the stressful situation involving her parents. Although Plaintiff was initially overwhelmed, she dealt with the stress and was able to cope. Throughout the treatment notes, there is evidence that Plaintiff was doing "okay," despite the situational stressors. Transient and expectable reactions to psychosocial stressors are not evidence of disabling mental limitations. Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994). The evidence shows that Plaintiff's parental situation had an impact on her. However, the treatment notes also show that medication and therapy alleviated her symptoms.

In conclusion, the treatment notes and the evidence do not support the restrictive opinions of Dr. Aneja and Nurse Fuller in their Medical Source Statement. Substantial medical evidence actually shows that Plaintiff was stressed for a short period of time due to her mother's illness, but was able to cope with the situation. The notes continually reveal benign mental health examination findings (Tr. 423, 450, 469). Plaintiff's thought processes were continually described as logical and organized

14

(Tr. 423, 450, 469). Plaintiff never disclosed any suicidal or homicidal ideations (Tr. 423, 450, 469). Plaintiff's concentration was described as getting better (Tr. 423), and her judgment and insight were good (Tr. 423, 450, 469).

In addition, Plaintiff argues the ALJ failed to set forth good reasons for discounting the opinion of Dr. Aneja and Nurse Fuller. However, the ALJ reasoned that their opinion was entitled to less weight because the evidence of record, including the treatment notes, indicated that Plaintiff responded well to medication and treatment (Tr. 31). Hence, this evidence supports discounting the opinion. 20 C.F.R. Sections 404.1527(c)(2); 416.927(c)(2) (stating that controlling weight is given to a treating source opinion only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence).

The ALJ also indicated that the opinions of Dr. Aneja and Nurse Fuller regarding Plaintiff's mental capacity to work was not entitled to controlling weight because Plaintiff's Crohn's disease was cited as support for their opinion (Tr. 31). Dr. Aneja and Nurse Fuller concluded that Plaintiff would have problems maintaining regular attendance and being punctual because of her Crohn's disease (Tr. 460). Here it is obvious that Dr. Aneja and Nurse Fuller were not determining Plaintiff's mental ability to maintain attendance and be punctual. Since these are her mental health providers, and they were providing their opinion regarding Plaintiff's mental capacity to work, they should not be opining on Plaintiff's physical condition. Hence, the ALJ correctly concluded the opinion in regard to physical condition was not entitled to controlling weight.

In conclusion, the ALJ correctly explained his reasoning for giving only some weight and not controlling weight to the opinion of Dr. Aneja and Nurse Fuller. Here, the ALJ gave very specific reasons for why he was discounting the Medical Source Statement of Dr. Aneja and Nurse Fuller. Furthermore, the ALJ gave a detailed analysis of all of the evidence of record when he designated Plaintiff's residual functional capacity assessment.

Next, Plaintiff argues that the ALJ misapplied *Drummond* (Pl.'s Br. at 14). In 2006, Plaintiff's first claim for disability benefits was denied. The ALJ here adopted the prior ALJ's RFC finding with respect to Plaintiff's physical impairments. Plaintiff argues that the ALJ "erroneously held that the updated medical evidence did not support a departure from the prior decision's RFC finding pursuant to Acquiescence Ruling (AR) 98-4 and *Drummond v. Comm'r*." (Pl.'s Br. at 14). In *Drummond*, the Sixth Circuit held that where a claimant files a subsequent disability claim, the Commissioner must adopt the findings of fact made in a prior disability determination unless new and material evidence establishes changed circumstances. *Drummond*, 126 F.3d 837, 847 (6th Cir. 1997).

This is not Plaintiff's first claim for DIB and SSI. On May 1, 2004, Plaintiff filed for DIB and SSI, alleging a disability onset date of September 30, 2003 (Tr. 102). On November 24, 2006, an ALJ held that Plaintiff was not entitled to DIB or SSI (102-7). The November 24, 2006 decision found Plaintiff had physical impairments, but no mental impairments (Tr. 104). The November 24, 2006 decision found that Plaintiff had the residual functional capacity to perform light work, at positions involving occasional supervision, with moderate to severe frequent pain symptoms, and the close availability of a restroom (Tr. 104). In this claim, Plaintiff asserted she has depression, which the ALJ also concluded (Tr. 26). Pursuant to *Drummond*, the ALJ here adopted the prior RFC with respect to Plaintiff's physical impairments and added limitations to account for the functional limitations resulting from Plaintiff's impairments (Tr. 28).

Based upon *Drummond*, substantial evidence supports the ALJ's decision to give some weight to the opinion of Dr. Aneja and Nurse Fuller. Furthermore, in this case, the ALJ correctly adopted the prior RFC findings in connection with Plaintiff's first claim and added additional limitations to account for the newly asserted mental impairment.

During the sequential evaluation analysis, the ALJ correctly determined Plaintiff's RFC. 20 C.F.R. Sections 404.1520(e), 404.1545. Substantial relevant evidence includes medical history,

16

medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, evidence of attempts to work, need for a structured living environment, and work evaluations. Social Security Ruling 96-8p.

The ALJ found Plaintiff could have frequent contact with the general public, co-workers, and supervisors (Tr. 28). Plaintiff contends that the record does not support this finding (Pl.'s Br. at 17). In support of her argument, Plaintiff relies on the opinion of Dr. Aneja and Nurse Fuller that her ability to relate to others is "poor" (Pl.'s Br. at 18). However, the ALJ only adopted the opinion of Dr. Aneja and Nurse Fuller to extent that it was consistent with his RFC findings and the objective medical evidence (Tr. 31). There is nothing else in the record to support Plaintiff's having more limited contact with others. The record establishes that Plaintiff's mental health stress stemmed from her mother and father (Tr. 462). However, this situational stressor was relieved by her medication regime and counseling (Tr. 462). Also, Plaintiff stated that her depression was stemming from her Crohn's disease (Tr. 462). Hence, the evidence does not show that Plaintiff's depression would result in functional limitations greater than those accounted for in the ALJ's RFC findings.

Next, Plaintiff argues that the ALJ erred in concluding that Plaintiff had moderate difficulties in concentration, persistence, and pace, while failing to include an appropriate limitation for these difficulties in the RFC findings. The ALJ allowed for Plaintiff to be off-task five percent of the time, while Plaintiff contends that twenty-five percent to fifty percent of the time is more appropriate (Pl.'s Br. at 18). Plaintiff refers to the ALJ's paragraph B findings in his evaluation of Plaintiff's depression under 12.04 of the listing of impairments (Tr. 27). 20 C.F.R. pt. 404, subpt. P, app. 1 Sections 12.04, 12.05, 12.06. However, the ALJ does not have to include paragraph B finding in his RFC finding. Paragraph B findings under the listings are findings at step three of the sequential evaluation process, and are not RFC findings pertaining to steps four and five of the sequential evaluation process. 20 C.F.R. pt. 404, subpt. P, app. 1, Section 12.00. Hence, the ALJ was correct in finding that Plaintiff

17

had moderate limitations in evaluating her mental impairment under the listings at step three of the sequential evaluation process, and in not including a "moderate limitation in concentration, persistence, and pace" in his residual functional capacity finding at steps four and five. At step four of the sequential evaluation process, the ALJ correctly considered the effect of Plaintiff's symptoms on her concentration, persistence, and pace when he allowed Plaintiff to be off task five percent of the time (Tr. 28).

Finally, Plaintiff argues that the vocational expert misinterpreted a portion of the ALJ's hypothetical question (Pl.'s Br. at 19). At the hearing, the ALJ posed a hypothetical to the vocational expert that included a limitation for occasional supervision, which the ALJ explained meant, "they're not working by themselves, but not being totally supervisors" (Tr. 79). On cross-examination, the vocational expert explained that a limitation for "occasional supervision" would limit the hypothetical worker to an unskilled setting (Tr. 79). Thus, the vocational expert interpreted the limitation to mean the hypothetical worker would be occasionally supervised.

The ALJ's RFC findings in his decision, however, states that Plaintiff "can occasionally supervise because of moderate to severe pain symptoms" (Tr. 28). Plaintiff argues the ALJ could not rely on the vocational expert's testimony because of this discrepancy (Pl.'s Br. at 20).

Based on this more restrictive interpretation, the vocational expert was still able to identify jobs that exist in significant numbers in the national economy that Plaintiff could perform. Hence, any error regarding the limitation for occasional supervision is a harmless error that would not change the ALJ's decision.

## **VIII. CONCLUSION**

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional

18

capacity (RFC) to perform jobs that exist in significant numbers in the national economy, and, therefore, was not disabled.  Hence, she is not entitled to DIB and SSI.

Dated: July 9, 2014          */s/George J. Limbert*
                                      GEORGE J. LIMBERT
                                      UNITED STATES MAGISTRATE JUDGE